806 So.2d 424 (2001)
Karen D'AMARIO, individually and on behalf of Clifford Harris, a minor, and Clifford Harris, individually, Petitioners,
v.
FORD MOTOR COMPANY, Respondent,
General Motors Corporation, etc., et al., Petitioners,
v.
Brian Nash, as Personal Representative of the Estate of Maria Nash, Respondent.
Nos. SC95881, SC96139.
Supreme Court of Florida.
November 21, 2001.
Rehearing Denied January 22, 2002.
*425 Joel D. Eaton of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, FL; Florin, Roebig & Walker, P.A., Clearwater, FL; and Wagner, Vaughan & McLaughlin, P.A., Tampa, FL, for Karen D'Amario, etc., et al., Petitioners.
Wendy F. Lumish and Jeffrey A. Cohen of Carlton, Fields, Ward, Emmanuel, *426 Smith & Cutler, P.A., Miami, FL; and Ronald E. Cabaniss and Francis M. McDonald of Cabaniss, Conroy & McDonald, P.A., Orlando, FL, for Ford Motor Company, Respondent.
Benjamin H. Hill, III, and Marie A. Borland of Hill, Ward & Henderson, Tampa, FL; William Powers, Jr., and Steven Goode, Austin, Texas; and Hugh F. Young, Jr., Reston, VA, for Product Liability Advisory Council, Inc., Amicus Curiae.
Daniel S. Pearson of Holland & Knight, Miami, FL; and Chilton Davis Varner, Halli D. Cohn, and Michelle Jerusalem Cole of King & Spalding, Atlanta, GA, for General Motors Corporation, etc., et al., Petitioners.
Mark Poses of Poses & Poses, P.A.; and Marc Cooper and Nancy C. Ciampa of Colson, Hicks & Eidson, Miami, FL, for Brian W. Nash, etc., et al., Respondents.
Benjamin H. Hill, III, and Marie A. Borland of Hill, Ward & Henderson, Tampa, FL; William Powers, Jr., and Steven Goode, Austin, Texas; and Hugh F. Young, Jr., Reston, VA, for Product Liability Advisory Council, Inc., Amicus Curiae.
PER CURIAM.
We have for review the decision in Ford Motor Co. v. D'Amario, 732 So.2d 1143 (Fla. 2d DCA 1999), which we have concluded conflicts with the decision in Nash v. General Motors Corp., 734 So.2d 437 (Fla. 3d DCA 1999), on the issue of whether principles of comparative fault apply in a crashworthiness case.[1] We hold that principles of comparative fault concerning apportionment of fault as to the cause of the underlying crash will not ordinarily apply in crashworthiness or enhanced injury cases.[2] Because the manufacturer alleged to be responsible for a defective product that results in a second accident and injury ordinarily may not be held liable for the injuries caused by the initial accident, the fault of the manufacturer may not be compared or apportioned with the fault of the driver of the vehicle who allegedly caused the initial crash.

SECONDARY INJURY CASES
Both cases before us involve lawsuits premised on the crashworthiness doctrine. Such cases, which are also often referred to as "secondary collision" or "enhanced injury" cases, involve both an initial accident and a subsequent or secondary collision caused by an alleged defective condition created by a manufacturer, which is unrelated to the cause of the initial accident but which causes additional and distinct injuries beyond those suffered in the primary collision. One court has explained that the damages sought in such cases "are not for injuries sustained in the original collision but for those sustained in the second impact where some design defect caused an exacerbated injury which would not have otherwise occurred as a result of the original collision." Meekins v. Ford Motor Co., 699 A.2d 339, 341 (Del.Super.Ct.1997).
The Eighth Circuit Court of Appeals first recognized a cause of action against an automobile manufacturer for enhanced injuries caused by a defective product in Larsen v. General Motors Corp., 391 F.2d *427 495 (8th Cir.1968). The Larsen court reasoned that "[n]o rational basis exists for limiting recovery to situations where the defect in design or manufacture was the causative factor of the accident, as the accident and the resulting injury, usually caused by the so-called `second collision' of the passenger with the interior part of the automobile, all are foreseeable." Id. at 502. While the court acknowledged that an "automobile manufacturer is under no duty to design an accident-proof or foolproof vehicle," it nevertheless concluded the following:
[s]uch manufacturer is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision. Collisions with or without fault of the user are clearly foreseeable by the manufacturer and are statistically inevitable.
Id. Accordingly, the court held:
Any design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design.
Id. at 502-03. The ruling in Larsen recognizing a distinct cause of action against manufacturers for secondary collisions caused by defective products has subsequently received widespread approval throughout the country.
Florida adopted the principle of Larsen in Ford Motor Co. v. Evancho, 327 So.2d 201, 202 (Fla.1976), wherein we declared: "We hold that a manufacturer of automobiles may be held liable under certain conditions for a design or manufacturing defect which causes injury but is not the cause of the primary collision." See also Ford Motor Co. v. Hill, 404 So.2d 1049, 1052 (Fla.1981) (extending crashworthiness doctrine to cases sounding in strict liability as well as negligence). However, while the crashworthiness doctrine is now well established in this state, it is not entirely clear whether or how the principles of comparative fault should apply in such cases.[3] That is the issue presented in the two cases before us today.

D'Amario
In D'Amario, Clifford Harris, a minor, was injured when the car in which he was riding as a passenger collided with a tree and then burst into flames. The car was driven by a friend of Harris who was allegedly intoxicated and speeding at the time of the accident.[4] As described in the opinion below:

*428 A witness to the crash circled the car twice and noticed a fire in the engine area. Some minutes later, the fire spread and an explosion occurred, engulfing the car in flames. Harris was severely injured, losing three limbs and suffering burns to much of his body.
D'Amario, 732 So.2d at 1145. Harris, and his mother, Karen D'Amario, sued Ford alleging that a defective relay switch in the automobile caused Harris's injuries. The plaintiffs did not seek damages against Ford for the injuries to Harris caused by the initial collision with the tree. Rather, they sought damages for the injuries caused by the alleged defective relay switch only. Ford asserted as an affirmative defense that the injuries were proximately caused by the negligence of a third party, although in its answer to the complaint, Ford did not specifically identify the vehicle's driver as a non-party tortfeasor.
At trial, the two sides advanced conflicting theories as to the cause of the fire and Harris's injuries. The plaintiffs' "theory of liability was that a relay switch failed, thus preventing it from disrupting the flow of power to the fuel pump." Id. Plaintiffs' experts "testified that gasoline continued to be pumped after the impact and caused the fire." Id. On the other hand, Ford's "experts countered that the relay switch and fuel pump properly worked and that the original crash caused an oil pan to burst, which resulted in an oil-based fire. [Ford] pointed to the slow spreading nature of the fire in support of its theory." Id. Hence, clear lines and choices for the jury were drawn between the positions of the parties, the plaintiffs asserting the failure of the manufacturer's product, and the manufacturer countering that its products worked properly and no failure occurred.
Prior to jury selection, the plaintiffs moved to exclude evidence about the driver's alcohol consumption on the day of the accident and the trial court ruled that evidence of the driver's alcohol consumption would be excluded.[5] The court reasoned that the acts leading up to the collision were not at issue, rather, the issue as to Ford's liability concerned events occurring after the initial collision with the tree. However, at trial, Ford moved to amend its affirmative defenses to include an allegation that Harris's injuries were caused by the fault of a third party, and proffered evidence of the driver's intoxication and excessive speed. The trial court granted Ford's request and held that an apportionment defense was available and evidence of the driver's actions in causing the initial accident could be admitted in support of such defense. In the face of such ruling, the parties stipulated to the jury that the negligent and excessive speed of the driver caused the initial accident and that at the time the driver had a blood alcohol level of.14 percent.
Following deliberations, the jury returned a verdict for the defense, finding that Ford was not a legal cause of the injuries to Harris. Because the jury found for the defense, it did not reach the question on the interrogatory verdict form as to the driver's comparative negligence. D'Amario subsequently moved for a new trial, alleging that the court erred in permitting evidence of the driver's intoxication to go to the jury. D'Amario also contended that the court erred in permitting *429 Ford to amend its affirmative defense to include the driver as a "Fabre party"[6] and to include him on the jury verdict form, where the defense had failed to comply with the advance pleading requirements of Nash v. Wells Fargo Guard Services, Inc., 678 So.2d 1262 (Fla.1996). In a supplemental memorandum to the court, D'Amario asserted that the driver's conduct was not a legal cause of Harris's injuries, and that the court's ruling during trial further prejudiced the plaintiffs because it came after the jury was selected, hence depriving the plaintiffs of the right to question the venire panel about potential bias towards alcohol consumption and driving while intoxicated.
The trial court granted the plaintiffs' motion for new trial. With regard to the apportionment defense issue, the trial court ruled there was no prejudice in allowing the defense to amend its affirmative defense during trial. However, the court ruled that it had erred in permitting evidence of the driver's alcohol content to go to the jury:
The Court now finds that by permitting the publication of the blood alcohol content to the jury, coupled with the remarks of defense counsel in closing arguments to the effect that the "animal in the car was `alcohol,'" caused undue emphasis to be placed on alcohol as a primary cause of the injury.... The Court found that under the Kidron[7] case that the Defendant was entitled to a jury finding of percentage of fault, if any, on the part of anyone whose negligence was the proximate cause of Plaintiff's damages.... While generally the right to amendment of pleadings declines as trial approaches, the Court here found no real prejudice was present in allowing Defendants to amend their affirmative defenses as was done and especially so since there was no doubt from the pleadings before the amendment as to whom the driver was. Nothing in the evidence offered before or after the amendment changes now the conclusion that under F.S. [§]90.403 the Court should have excluded the remote condition of alcohol from the case.
When Ford appealed, the Second District Court of Appeal reversed, holding that "[o]n the facts in this crash-worthiness case, the appellant [Ford] properly raised an apportionment defense." D'Amario, 732 So.2d at 1145 (citing Kidron, Inc. v. Carmona, 665 So.2d 289 (Fla. 3d DCA 1995)).

Nash
While Maria Nash was driving to church with her two children in the back seat of her 1990 Chevrolet Corsica, a car approaching from the opposite direction crossed the center line and crashed into Nash's car. Nash's head struck the metal post that separates the windshield from the driver's door. She later died as a result of her head injuries, although her two children survived. The record reveals that the driver of the other car was intoxicated and had a blood alcohol content of.15 percent. Nash's estate filed suit against General Motors, the manufacturer of the vehicle Nash was driving at the time of the accident, alleging a failure of the vehicle's seatbelt and "that General Motors was strictly liable for a design defect which had been discovered in the seatbelt of the 1990 Chevrolet Corsica." Nash, 734 So.2d at 439. As in D'Amario, the district court's opinion reflects that prior to trial,
the estate asked the trial court to exclude evidence of the other driver's intoxication. *430 The estate argued that such evidence would be too prejudicial in the jury's consideration of comparative fault. In ruling on this matter, the trial court relied on this court's decision in Stellas v. Alamo Rent-A-Car Inc., 673 So.2d 940 (Fla. 3d DCA) (holding that a nonparty intentional tortfeasor should appear on the verdict form so as to permit the jury to apportion fault with the negligent tortfeasor), review granted, 683 So.2d 485 (Fla.1996), and decision quashed by 702 So.2d 232 (Fla.1997). Accordingly, the trial court found that the jury "had a right to know all the facts" concerning someone who appears on the verdict form.
Nash, 734 So.2d at 439. The jury ultimately found no liability on the part of the automobile manufacturer, General Motors, and therefore did not consider the percentage of fault that should be attributed to the drunk driver who caused the accident. The trial court denied the estate's motion for new trial.
On appeal, the estate asserted that the evidence that Charles Chatfield, the other motorist, was intoxicated, was irrelevant and unduly prejudicial to the issue of whether General Motors was negligent in designing a defective seatbelt. The Third District agreed, holding that it was error to permit the jury to apportion fault between an intentional tortfeasor and a negligent tortfeasor. See id. (citing Stellas v. Alamo Rent-A-Car, Inc., 702 So.2d 232 (Fla.1997)).[8] The district court concluded that "it was error for the drunk driver, an intentional tortfeasor, to appear on the same verdict form as General Motors, the negligent tortfeasor in a products liability action." Id. at 441. Accordingly, the district court reversed the trial court's order and remanded the case to the circuit court for a new trial. See id.

ANALYSIS

Comparative Fault In Crashworthiness Cases
As noted above, although we recognized the crashworthiness doctrine in Evancho some time ago, the issue of whether principles of comparative fault apply in enhanced injury cases is one of first impression for this Court. It appears that the first case in Florida to have addressed this issue is Kidron, Inc. v. Carmona, 665 So.2d 289 (Fla. 3d DCA 1995), wherein the Third District held that an automobile manufacturer in a crashworthiness case may apportion fault with the plaintiff based on the plaintiff's contributory negligence in causing the initial impact. There, the plaintiff's husband was killed in an auto accident after his car crashed into the back of a stalled delivery truck manufactured by Kidron. The plaintiff sued Kidron in strict liability alleging that it assembled a truck without a rear underguard, which if installed would have prevented the decedent's car from being forced under the truck's bed during the collision. Kidron asserted a comparative fault defense based on the decedent's alleged negligence in failing to avoid hitting the stalled truck. The trial court refused to allow this defense and the plaintiff prevailed at trial. On appeal, the Third District held that the principles of comparative fault apply in a strict liability suit regardless of whether the injury at issue resulted from the primary or secondary *431 collision. See id. at 292. The court reasoned:
This view is based on the belief ... that fairness and good reason require that the fault of the defendant and of the plaintiff should be compared with each other with respect to all damages and injuries for which the conduct of each party is a cause in fact and a proximate cause.
Id. (citing § 768.81, Fla. Stat. (1993)). In so concluding, the court rejected the argument that a plaintiff's comparative fault should not be considered in the secondary collision context. See id. Without discussion, the court noted that the plaintiffs argument represented a minority view, and the court declined to follow it. See id.

The Majority View
Outside of Florida, courts have wrestled with the comparative fault issue and have adopted conflicting views. Under what has been characterized by Whitehead v. Toyota Motor Corp., 897 S.W.2d 684 (Tenn.1995), as the "majority view," the fault of the plaintiff or a third party in causing the initial accident is recognized as a defense to a crashworthiness case against a product manufacturer. This line of cases reasons that the fault of the person causing the accident that created the circumstances in which the second accident occurred should be compared with the role of the automobile manufacturer's negligence in designing a defective product in assessing total responsibility for the claimant's injuries. See Montag v. Honda Motor Co., 75 F.3d 1414, 1419 (10th Cir.1996) (interpreting Colorado law);[9]Keltner v. Ford Motor Co., 748 F.2d 1265, 1267 (8th Cir.1984) (applying Arkansas law); Hinkamp v. American Motors Corp., 735 F.Supp. 176, 178 (E.D.N.C.1989), aff'd, 900 F.2d 252 (4th Cir.1990); General Motors Corp. v. Farnsworth, 965 P.2d 1209, 1218 (Alaska 1998) (holding it was error not to instruct jury on plaintiff's comparative fault in a strict liability action against manufacturer based on defective seatbelt and not to allocate fault to third person who may have caused the accident); Doupnik v. General Motors Corp., 225 Cal.App.3d 849, 275 Cal.Rptr. 715 (1990) (holding that *432 doctrine of comparative fault is applicable in crashworthiness cases); Meekins v. Ford Motor Co., 699 A.2d 339, 346 (Del.Super.Ct.1997); Day v. General Motors Corp., 345 N.W.2d 349, 351, 357-58 (N.D. 1984) (holding that both plaintiff's accident causing fault and injury enhancing fault should be considered in determining extent of plaintiff's recovery); Whitehead, 897 S.W.2d at 693-94. As the Supreme Court of Tennessee has stated, "The majority view is based on the belief that the fault of the defendant and of the plaintiff should be compared with each other with respect to all the damages and injuries for which the conduct of each party is a cause in fact and a proximate cause." Whitehead, 897 S.W.2d at 693-94.
In Meekins v. Ford Motor Co., a Delaware trial judge set out a comprehensive analysis discussing the arguments on both sides of the issue, before ultimately concluding that principles of comparative fault should apply in enhanced injury cases. First, the court reasoned that while some cases may present a clear factual delineation between primary injuries and secondary injuries, whereby the driver's comparative fault should be excluded from consideration, most cases do not. The court stated that there are usually several acts of negligence involved, all of which may have been a cause of the plaintiffs injuries, and "it would be difficult and confusing to instruct a jury that it should not consider the cause of the collision but only the cause of the enhanced injuries." 699 A.2d at 345. Second, the court was concerned that a rule excluding consideration of the plaintiff driver's fault in causing an accident would logically extend to prevent the plaintiff from suing a negligent third party who caused the accident, and thereby run counter to well-established principles of tort law:
Another logical hurdle inherent in plaintiff's position is this. If a plaintiff negligently crashes his vehicle into a tree and suffers an enhanced injury because of a design defect in his car, plaintiff says that the manufacturer is liable for the enhanced injury regardless of the plaintiff's negligence in causing the collision. But what if a plaintiff collides with another vehicle and the driver of that vehicle is negligent? Assume also that the enhanced injuries caused to the plaintiff by a design defect in his car are clearly identifiable. Under ordinary rules of proximate cause the other driver would have potential liability for all of the plaintiff's injuries, but logically, following the enhanced injury theory of the plaintiff, only the manufacturer should have the liability because the other driver's conduct in causing the initial collision would not have caused the injury absent the design defect. Thus, carrying the theory to its logical conclusion, plaintiff should have no recovery against the other driver for his negligence in causing the collision. This result would run counter to well settled principles of tort law.
Id. Finally, the court noted that the rule concerning proximate causation should be no different in enhanced injury cases than that applied in ordinary negligence cases. It reasoned that "[t]he existence of other proximate causes of an injury does not relieve a plaintiff driver under Delaware's comparative negligence statute from responsibility for his own conduct which proximately caused him injury.... Public policy seeks to deter not only manufacturers from producing a defective product but to encourage those who use the product to do so in a responsible manner." Id. at 345-46. Thus, the court concluded that "[i]t is obvious that the negligence of a plaintiff who causes the initial collision is one of the proximate causes of all of the injuries he sustained, whether limited to *433 those the original collision would have produced or including those enhanced by a defective product in the second collision." Id. at 346.

The Minority View
In contrast to the approach of the "majority" view, the "minority" view, rejecting the application of comparative fault principles, focuses on the underlying rationale for imposing liability against automobile manufacturers for secondary injuries caused by a design defect. The federal district court in Jimenez v. Chrysler Corp., 74 F.Supp.2d 548 (D.S.C.1999), reversed in part and vacated, 269 F.3d 439 (4th Cir. 2001), explained the essential rationale of the minority view:
The crashworthiness doctrine imposes liability on automobile manufacturers for design defects that enhance, rather than cause, injuries. The doctrine applies if a design defect, not causally connected to the collision, results in injuries greater than those that would have resulted were there no design defect. The issue for purposes of a crashworthiness case, therefore, is enhancement of injuries, not the precipitating cause of the collision.
74 F.Supp.2d at 565 (citations omitted). The district court in Jimenez pointed out that the rule of damages in crashworthiness cases also effectively acts to apportion fault and responsibility between the first and second collisions and their respective causes:
First of all, such a rule intrinsically dovetails with the crashworthiness doctrine: Because a collision is presumed, and enhanced injury is foreseeable as a result of the design defect, the triggering factor of the accident is simply irrelevant. Secondly, the concept of "enhanced injury" effectively apportions fault and damages on a comparative basis; defendant is liable only for the increased injury caused by its own conduct, not for the injury resulting from the crash itself. Further, the alleged negligence causing the collision is legally remote from, and thus not the legal cause of, the enhanced injury caused by a defective part that was supposed to be designed to protect in case of a collision.
Id. at 566 (emphasis added). Under this reasoning, concerns about fairness in apportioning responsibility for damages based upon fault in crashworthiness cases are satisfied by the limitation of liability of a manufacturer to only those damages caused by the defective product.
Hence, the primary reason offered by courts excluding evidence of the driver's fault in causing an accident is that the accident-causing fault is not relevant to whether an automobile manufacturer designed a defective product, and, further, that such evidence, if admitted, may be unduly prejudicial to the plaintiff. See Cota v. Harley Davidson, 141 Ariz. 7, 684 P.2d 888, 895-96 (Ct.App.1984) (holding that evidence of the plaintiff's intoxication and conduct in causing the initial accident was not relevant in a crashworthiness case against a motorcycle manufacturer based on a design defect in the motorcycle's gas tank system); Andrews v. Harley Davidson, Inc., 106 Nev. 533, 796 P.2d 1092, 1095 (1990) (holding that evidence of plaintiff's intoxication on night of accident was not relevant to whether motorcycle manufacturer's design defect proximately caused plaintiff's injuries); cf. Green v. General Motors Corp., 310 N.J.Super. 507, 709 A.2d 205, 212-13 (Ct.App.Div.1998) (holding that plaintiff's excessive speed was not relevant to issue of defective design but was relevant to issue of proximate cause of injuries).
Consistent with this approach, the Iowa Supreme Court has held that evidence of *434 the plaintiff's intoxication and excessive speed is not admissible in a crashworthiness case against a vehicle manufacturer. In Reed v. Chrysler Corp., 494 N.W.2d 224 (Iowa 1992), the court explained:
The theory, which presupposes the occurrence of accidents precipitated for myriad reasons, focuses alone on the enhancement of resulting injuries. The rule does not pretend that the design defect had anything to do with causing the accident. It is enough if the design defect increased the damages. So any participation by the plaintiff in bringing the accident about is quite beside the point.
494 N.W.2d at 230.
Some commentaries on the crashworthiness doctrine also support the view that the accident-causing fault of the driver should not be compared with the fault of an automobile manufacturer whose product caused an enhanced injury. See, e.g., Robert C. Reichert, Limitations on Manufacturer Liability in Second Collision Actions, 43 Mont. L.Rev. 109, 117-20 (1982). In contrast to the majority view that all possible causes of an injury should be considered, Reichert stresses that accident-causing fault must be distinguished from injury-enhancing fault; otherwise manufacturers of a defective product will be shielded from liability in every second injury case, a result contrary to the holding in Larsen and contrary to the purpose for which the crashworthiness doctrine was first recognized. See id. at 117-18. Reichert asserts that because Larsen established "new precedent by holding that a manufacturer would be liable for enhanced injuries even though the design defect did not cause the first collision[,][i]mplicit in this holding is the rule ... [that] accident-causing fault cannot be compared with injury-enhancing fault." Id. at 118.[10] He explains:
[B]y definition, a manufacturer in a second collision action has zero percent accident-causing fault, so there is always 100 percent accident-causing fault to be considered in mitigation of a manufacturer's injury-enhancing fault. One hundred percent accident-causing fault compared with a manufacturer's injury-enhancing fault will always constitute a superseding cause of enhanced injuries, thereby insulating a manufacturer from liability in every second collision action and contradicting the holding in Larsen and the axiom.
Id. In other words, Reichert contends, to permit a manufacturer to apportion fault with a third party or the plaintiff's conduct in causing the accident, manufacturers would effectively avoid liability for designing and manufacturing a defective product, and would thus countermine the essential purpose for which the crashworthiness doctrine was established.

Florida Law
The automobile manufacturers urge us to adopt the "majority" view and contend that Florida statutory and case law requires juries to apportion fault among all persons who contributed to the resulting injuries and that enhanced-injury cases do not constitute an exception to this well-established rule. They cite section *435 768.81(3), Fla. Stat. (1997), which provides for the entry of "judgment against each party liable on the basis of such party's percentage of fault" and this Court's interpretation of the statute in Fabre v. Marin, 623 So.2d 1182 (Fla.1993).
In Fabre this Court concluded "that section 768.81 was enacted to replace joint and several liability with a system that requires each party to pay for noneconomic damages only in proportion to the percentage of fault by which that defendant contributed to the accident." Id. at 1185. We interpreted the term "party" to include all persons who contributed to the accident "regardless of whether they have been or could have been joined as defendants." Id. However, it is not entirely clear that our holding in Fabre resolves the question presented today since Fabre involved a simple automobile accident involving joint and concurrent tortfeasors, and did not involve successive tortfeasors or enhanced or secondary injuries allegedly stemming from a manufacturing or design defect.
On the other hand, the estate and D'Amario contend that our statutory and case law support the minority view. They rely on Florida case law dealing with successor tortfeasors and analogous circumstances. After considering the majority and minority views discussed above, we conclude that the minority view is more consistent with the principles of tort law and comparative fault as presently developed in Florida.

Medical Malpractice Cases
We have searched for an appropriate analogy to help us resolve the issue. In the context of a medical neglect case, for example, courts in this state have concluded that (1) the cause of an initial injury which may require medical assistance is not ordinarily considered as a legal cause of injuries resulting from the subsequent negligence of the medical-care provider;[11] and (2) an initial wrongdoer who causes an injury is not to be considered a joint tortfeasor[12] with a subsequent medical provider whose negligence enhances or aggravates injuries caused by the initial wrongdoer. In other words, in cases involving medical malpractice, the cause of the underlying condition that brought the patient to the professional, whether a disease or an accident, is not to be compared to the cause of the independent enhanced injury allegedly resulting from medical neglect. See Frank M. Stuart, M.D., P.A. v. Hertz Corp., 351 So.2d 703 (Fla.1977). In Hertz Corp. we held:
Having finally decided the issue in favor of contribution among joint tortfeasors in Lincenberg v. Issen, 318 So.2d 386 (Fla.1975), the Court here finds itself faced with the question of whether to apportion the loss between initial and subsequent rather than joint or concurrent tortfeasors. This cannot be done.
Id. at 706. In Hertz Corp. we held that an initial tortfeasor, upon being sued by the injured party, could not join a medical professional in the same action and seek indemnity for damages caused by medical negligence in the treatment of the injured party.
However, this principle is to be distinguished from the principle that the initial tortfeasor may be held responsible for all subsequent injuries including those caused by medical negligence. See Hertz Corp.; *436 see also Underwriters at Lloyds v. City of Lauderdale Lakes, 382 So.2d 702, 703 (Fla. 1980); Association for Retarded Citizens-Volusia, Inc. v. Fletcher, 741 So.2d 520, 524-25 (Fla. 5th DCA 1999); Dungan v. Ford, 632 So.2d 159, 162 (Fla. 1st DCA 1994); Rucks v. Pushman, 541 So.2d 673, 675 (Fla. 5th DCA 1989). In fact, the rule of complete liability of initial tortfeasors, if interjected into the trial of a claim for medical malpractice or secondary collisions based upon a product defect, would only serve to create additional confusion for a jury charged to resolve the secondary collision claim. See Hertz Corp., 351 So.2d at 706.[13]
The circumstances considered in Whitehead v. Linkous, 404 So.2d 377 (Fla. 1st DCA 1981), further illustrate the medical malpractice analogy. In Whitehead, the plaintiff's decedent was brought to the defendant hospital after he attempted to commit suicide. While under the care of the treating doctor, Whitehead died. An expert testified that the care received by Whitehead deviated from the standard practice in the community and that but for the doctor's negligence, Whitehead would have survived. The jury was instructed that it could consider Whitehead's own conduct as a defense to the medical malpractice claim against the doctor and hospital and the jury returned a verdict for the defense.
On appeal, however, the First District reversed, holding that Whitehead's conduct was too remote and could not be considered the proximate legal cause of his injuries from the alleged professional malpractice. The court reasoned:
A remote condition or conduct which furnishes only the occasion for someone else's supervening negligence is not a proximate cause of the result of the subsequent negligence.... Since Whitehead's death would not have occurred "but for" the negligent acts or omissions of the hospital and the doctor, those acts and omissions must be deemed the cause of the injury. See Fellows v. Citizens Savings & Loan Association of St. Lucie County, 383 So.2d 1140 (Fla. 4th DCA 1980); Bryant v. Jax Liquors, 352 So.2d 542 (Fla. 1st DCA 1977). Stated differently, any conduct on Whitehead's part before he entered the hospital which contributed to his cardiac and pulmonary arrest and subsequent death was not a proximate, legal cause of the damages sought in this case. Accordingly, we find that the trial court erred in submitting the instruction on comparative negligence to the jury over the prior and timely objection of counsel.
Id. at 379 (emphasis added).[14] The reasoning in Whitehead is similar to the rationale upon which the "minority" view of the application of comparative fault principles to the crashworthiness doctrine is based. Both focus on the particular cause "of the damages sought in this case." Id.
As noted above, unlike automobile accidents involving damages solely arising from the collision itself, a defendant's liability in a crashworthiness case is predicated upon the existence of a distinct and *437 second injury caused by a defective product, and assumes the plaintiff to be in the condition to which he is rendered after the first accident. No claim is asserted, however, to hold the defendant liable for that condition. Thus, crashworthiness cases involve separate and distinct injuries-those caused by the initial collision, and those subsequently caused by a second collision arising from a defective product. We agree that when viewed in this light, crashworthiness cases may be analogized to medical malpractice cases involving a successive negligent medical provider who is alleged to have either aggravated an existing injury or caused a separate and additional injury. Thus, just as the injury-causing fault of the patient in Whitehead was held not relevant in assessing the doctor's subsequent and separate negligence, the accident-causing fault of the driver would not be relevant in crashworthiness cases in assessing a manufacturer's neglect in designing an automobile or its parts. The initial accident merely furnished the occasion for the manufacturer's fault to be tested.
Hence, a primary collision, by whatever cause, is presumed to have occurred in crashworthiness cases, and it is further presumed that a manufacturer, like a physician, may not be held responsible for the injuries caused by the primary collision. Further, only the cause of the enhanced injury is at issue in crashworthiness cases such as those at issue here because the only damages sought are those caused by the defective products. Thus the focus in such cases against a manufacturer is not on the conduct that gave rise to the initial accident, but rather, on the conduct that allegedly caused the enhanced or secondary injuries. It will always be conceded in such cases that the fault of others was completely responsible for the happening of the first accident. However, as with medical negligence cases, the accident or event giving rise to the initial injuries merely creates the occasion for the second impact or action to occur.
We agree that to automatically compare the fault of the driver in causing the accident with the fault of the automobile manufacturer for the subsequent enhanced injury would be, as Reichert explains, to confuse two different causes-the cause of the accident and the cause of the enhanced injury. See Reichert, Limitations on Manufacturer Liability in Second Collision Actions, supra, at 117-18. The essential point is that under the crashworthiness doctrine, as in medical malpractice cases, the initial collision and its separate cause is always presumed, and the cause of the initial collision is simply not at issue in the determination of the cause of the second collision. Instead, any analysis concerning the causal connection of the second collision to the separately claimed damages depends solely upon whether a defect existed and gave rise to the enhanced injuries suffered by the plaintiff.

Intentional Tort Exception to Comparative Fault
The estate and D'Amario also contend that even if we were to hold that the comparative fault principles of section 768.81, Florida Statutes (1997), apply to crashworthiness cases, we should hold that this case falls within the intentional tort exception to section 768.81. Section 768.81(4)(b) states that the comparative fault statute does not apply "to any action based upon an intentional tort." Id. § 768.81(4)(b). They urge this Court to approve Nash's holding that drunk driving constitutes an intentional tort under this exception. We decline to do so.
*438 In holding that drunk driving is an intentional tort, the court in Nash relied on this Court's reasoning in Ingram v. Pettit, 340 So.2d 922, 925 (Fla.1976), wherein we stated that "[d]riving in an intoxicated condition is an intentional act which creates known risks to the public." However, the sole issue in that negligence case was whether the jury should be allowed to consider a claim for punitive damages based on the defendant's negligent conduct of driving while intoxicated. See id. at 923. The plaintiff argued that the defendant's intoxication and erratic driving provided the egregiousness necessary for an award of punitive damages. This Court agreed, holding that "the voluntary act of driving `while intoxicated' evinces, without more, a sufficiently reckless attitude for a jury to be asked to provide an award of punitive damages if it determines liability exists for compensatory damages." Id. at 924. Hence, our ruling in Ingram was directed to the showing required to justify an award of punitive damages, and not to the issue of whether the cause of action constituted an intentional tort. Once the Court's above-mentioned statements concerning the intentional act of drunk driving are placed in proper context, it is apparent that Ingram does not stand for the proposition that driving while intoxicated is an intentional tort. Indeed, the Court's reasoning was applied in a case based on negligent conduct albeit it was claimed that the negligent driving took place because of the alleged intoxication.
This Court has defined an intentional tort as one in which the actor exhibits a deliberate intent to injure or engages in conduct which is substantially certain to result in injury or death. See Turner v. PCR, Inc., 754 So.2d 683 (Fla.2000). In Spivey v. Battaglia, 258 So.2d 815 (Fla. 1972), this Court explained the difference between negligence and intentional torts. Relying on Prosser and the Restatement (Second) of Torts § 8A (1965), we explained:
Where a reasonable man would believe that a particular result was substantially certain to follow, he will be held in the eyes of the law as though he had intended it.... However, the knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent. Thus, the distinction between intent and negligence boils down to a matter of degree. "Apparently the line has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable man would avoid (negligence), and become a substantial certainty."
Id. at 817 (quoting William L. Prosser, The Law of Torts 32 (3d ed.1964)) (footnote omitted). While acting under the influence of alcohol may sometimes justify an award of punitive damages against the offender, we cannot conclude that negligent conduct induced by the use of alcohol constitutes an independent intentional tort under our "substantially certain" test for intentional torts. Accordingly, we reject the estate and D'Amario's contention that driving while intoxicated is an independent intentional tort. Cf. Wong-Leong v. Hawaiian Independent Refinery, Inc., 76 Hawai`i 433, 879 P.2d 538, 545 n. 9 (1994) ("The act of driving under the influence is clearly a negligent act[.]"); People v. Townsend, 214 Mich. 267, 183 N.W. 177, 179 (1921) (noting that driving an automobile while intoxicated is "gross and culpable negligence"); Stinson v. Daniel, 220 Tenn. 70, 414 S.W.2d 7, 10 (1967) (noting that driving while drunk constitutes wanton negligence). Hence, we do not find that the intentional tort exception to the comparative fault statute may be invoked.[15]

*439 No Liability For Initial Accident
We are not unmindful of the concerns that a manufacturer not end up improperly being held liable for damages caused by the initial collision. Of course, we must remember that in crashworthiness cases the plaintiff not only has the burden of proving the existence of a defect and its causal relationship to her injuries, but she must also prove the existence of additional or enhanced injuries caused by the defect. In this regard, we are impressed with the reasoning of the federal district court in Jimenez that the proper application of the crashworthiness doctrine is also consistent with comparative fault principles. The major concern of those courts following the majority rule is in seeing that successive tortfeasors only be held liable for the damages they cause, and not be held liable for damages caused by the initial tortfeasor. We agree with this *440 concern, but see no reason why it cannot be properly addressed, as in Jimenez, by a recognition of the crashworthiness doctrine's legal rationale limiting a manufacturer's liability only to those damages caused by the defect.
Further, when appropriate, the defendant manufacturer in a crashworthiness case will be entitled to have the jury told that no claim is being made for damages arising out of the initial accident, and that the manufacturer should not be held liable for damages caused by the initial collision. Indeed, such an instruction should ensure, much like our holding in Fabre, that no defendant will be held responsible for damages it did not cause. Such an instruction should have much the same effect as an instruction on comparative fault, but without the worrisome baggage of retrying the cause of the underlying accident in the crashworthiness case. As these cases illustrate, and as we have discussed above, trying both issues together can result in substantial confusion.[16]

Juror Confusion
We also conclude that to inject the issue of the driver's fault in causing the initial accident into the trial of a crashworthiness case tends to unduly confuse the jury by focusing attention on the conduct giving rise to the accident instead of the issues of the existence of a defect and its role in causing the enhanced injuries. Such confusion is magnified in cases such as D'Amario and Nash, which involve intoxicated drivers, due in large measure to the public's understandable intolerance of drunk driving. Indeed, both cases exemplify the confusion caused by focusing on the conduct of a drunk driver and the attendant difficulty juries have in separating the accident-causing fault from the enhanced-injury-causing fault in such cases. While there may be a legitimate issue as to whether the claimant's injuries were caused by the defect, if any, or by the original collision, there is no reason to also litigate the cause of that initial collision.
For example, in both D'Amario and Nash, evidence of the driver's intoxication was admitted in evidence, and both Ford and General Motors were permitted to point the finger at the intoxicated drivers as the cause of the accidents and all of the plaintiffs' resulting injuries. In D'Amario, the jury was told by the court that the parties had stipulated that the driver's excessive speed and intoxication caused the accident. During closing argument, Ford's counsel argued to the jury that the cause of Clifford Harris's injuries was the driver's intoxication and the fact that he "slammed into a pine tree doing 40 miles an hour."[17]
In Nash, evidence of the driver's intoxication was presented that was even more pervasive. During voir dire, defense counsel asked the venire panel about their *441 views on drunk driving. Then, during opening statements, the defense argued that the evidence would show that "at the end of the day ... the real fault in the case is not anything GM did or did not do with this retractor. It is instead the fault of Charles Chatfield, who that Sunday afternoon, got drunk and then got deadly when he barrelled [sic] his 4500-pound Cadillac into the Nash Corsica." The defense introduced evidence of Chatfield's intoxication during trial while cross-examining the investigating officer at the scene of the accident. Officer Medina testified that Chatfield's breath smelled of alcohol and his blood-alcohol level was .15. Finally, during closing argument, the defense argued:
We have got a drunk who gets in a car and goes out on a public thoroughfare and wipes out the life of Carmen Nash and changes the lives of all of those in her family. That's what we have got here: a drunk who aimed his car at Carmen Nash and killed her. And it is that which is the sole cause of the injuries in this case. That is where the blame lies, that is where the fault lies.
The defense made numerous other references to Chatfield's intoxication throughout closing argument"Charles Chatfield was a drunk," "a disaster in the form of a cream-colored Cadillac driven by a drunk who came blasting out of the blue that Sunday afternoon and snuffed out the life of Carmen Nash." Thus, it is apparent that the defendants in both cases were permitted to effectively shift the focus of the trial from the existence of a defect to the driver's conduct in driving while intoxicated,[18] even though the existence of a defect was the fundamental liability issue to be tried in these cases.

CONCLUSION
In sum, we hold that principles of comparative fault involving the causes of the first collision do not generally apply in crashworthiness cases. Such a rule, we believe, recognizes the important distinction between fault in causing the accident and fault in causing additional or enhanced injuries as a result of a product defect, a distinction that defines and limits a manufacturer's liability in crashworthiness cases. In such cases, the automobile manufacturer is solely responsible for the enhanced injuries to the extent the plaintiff demonstrates the existence of a defective condition and that the defect proximately caused the enhanced injuries. Thus, an automobile manufacturer who allegedly designed a defective product may not be held liable for damages caused by the initial collision and may not apportion its fault with the fault of the driver of the vehicle who caused the initial accident.
We believe this rule will ensure both fairness in the apportionment of damages and that the jury will not be unduly confused about the issues in the case, especially in cases like those before us today, *442 where both accidents involved drinking and driving. Because the initial collision is presumed in crashworthiness cases, the jury's focus in such cases should be on whether a defect existed and whether such defect proximately caused the enhanced injuries. Unfortunately, in the consolidated cases, the juries' focus was shifted to the conduct of the intoxicated drivers who caused the initial accidents. In light of the confusion caused by the introduction of accident-causing fault and the improper focus placed on the non-party drivers' intoxication in each case, we conclude that both the estate and D'Amario are entitled to a new trial.[19]
Accordingly, we quash the Second District's decision in D'Amario and approve the Third District's decision in Nash to the extent it is consistent with this opinion. We further disapprove the opinion in Kidron to the extent it is inconsistent with our holding herein.
It is so ordered.
SHAW, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
WELLS, C.J., concurs in part and dissents in part with an opinion, in which HARDING, J., concurs.
WELLS, C.J., concurring in part and dissenting in part.
I cannot agree with the majority's general holding,[20] the adoption of either the purported majority or minority views as described by the majority opinion, or the application of Frank M. Stuart, M.D., P.A. v. Hertz Corp., 351 So.2d 703 (Fla.1977), to secondary injury products liability cases.
With respect to the majority's holding, I conclude that stating that comparative negligence "will not ordinarily apply" simply will be too difficult for trial judges to fairly administer. We have uniformly held that comparative negligence does apply in products liability cases since the adoption of strict liability in West v. Caterpillar Tractor Co., 336 So.2d 80, 90 (Fla.1976). The law on this issue was recently fully examined, explained, and reaffirmed in Standard Havens Products v. Benitez, 648 So.2d 1192 (Fla.1994).
Next, I do not find it necessary to adopt either the majority or minority rule because we already have sufficient rules to apply in these cases to resolve the main issue. In my view, the main issue presented by these consolidated cases is how to handle the state of intoxication of the other driver who causes the initial wreck. I recognize that the driver's intoxication has the potential of distorting these cases because the emotional nature detracts from the proper focus of the case, but a trial judge has the discretion under section 90.403, Florida Statutes (2000), to control *443 the evidence and ensure that the driver's intoxication does not misdirect the jury's proper focus. Thus, there is no need to add another set of rules to be followed. Furthermore, our recent decision in Gross v. Lyons, 763 So.2d 276 (Fla.2000), applies to many of these cases because usually there is a jury issue with regard to the proper apportionment of damages between the initial collision and the manufacturing defect.
Finally, I do not agree with the application of Hertz Corp. to these cases because that case in reality involved issues of indemnity and contribution, i.e., the difference between active and passive tortfeasors and how those issues were to be procedurally handled. There are sound policy reasons for doing this when the case involves allegations of negligence by a treating physician following an automobile accident. But that case should be limited to cases involving the issue of subsequent medical malpractice, which presents procedural hurdles when added to the accident case.
Therefore, I concur in result only with the majority's quashing of the Second District's decision in Ford Motor Co. v. D'Amario, 732 So.2d 1143 (Fla. 2d DCA 1999). I conclude that the D'Amario case should be decided by applying this Court's long-standing precedent concerning a trial court's authority to rule on a motion for a new trial. Specifically, the D'Amario case is governed by a straightforward application of those decisions in which this Court has recognized that a trial court's ruling on a motion for a new trial is vested in the sound, broad discretion of the trial court. See Brown v. Estate of Stuckey, 749 So.2d 490, 495 (Fla.1999) (trial court is vested with broad discretionary power to grant motion for new trial to prevent miscarriage of justice); Allstate Ins. Co. v. Manasse, 707 So.2d 1110, 1111 (Fla.1998) ("The judicial determination on a motion for a new trial is a discretionary act of the trial court."); Cloud v. Fallis, 110 So.2d 669, 673 (Fla.1959) ("When a motion for new trial is made it is directed to the sound, broad discretion of the trial judge...."). Under these precedents, an appellate court applies a reasonableness test to a trial court's ruling on such a motion, and the appellate court should not disturb the trial court's ruling absent an abuse of discretion. See Brown, 749 So.2d at 498 ("[T]he appellate court must employ the reasonableness test to determine whether the trial judge abused his or her discretion."); Manasse, 707 So.2d at 1111 ("The appellate court should apply the reasonableness test to determine whether the trial judge abused his [or her] discretion...."); Cloud, 110 So.2d at 673 ("[T]he ruling should not be disturbed in the absence of a clear showing that discretion has been abused.").
The trial court in the D'Amario case concluded when ruling on the motion for new trial that
permitting the publication of the blood alcohol content to the jury, coupled with the remarks of defense counsel in closing arguments to the effect that the "animal in the car was `alcohol,'" caused undue emphasis to be placed on alcohol as a primary cause of the injury.... Nothing in the evidence offered before or after the amendment changes now the conclusion that under F.S. [§]90.403 the Court should have excluded the remote condition of alcohol from the case.
D'Amario v. Ford Motor Company, No. 93-2290-21-CI, order at 8-9 (Fla. 6th Cir. Ct. order filed April 30, 1997). Clearly, it cannot be concluded that no reasonable trial court would have made that decision. I would apply Brown, Manasse, and Cloud, which appear to me to compel the *444 conclusion that the district court's decision must be quashed.
Moreover, I find that the trial court addressed this issue correctly in ruling on the motion for rehearing. The trial court recognized that it had discretion under section 90.403, Florida Statutes (1997), in respect to the evidence presented to the jury. The trial court's ruling does not mean that comparative negligence was not a proper issue for the jury's consideration. Rather, this ruling simply recognizes that the probative value associated with the presentation of the other driver's blood alcohol level was outweighed by the resulting prejudice. For these reasons, I find that the trial court did not abuse its discretion in granting the motion for a new trial. Accordingly, I would find that the Second District erred in reversing the trial court's ruling granting a new trial.
With regard to the consolidated case from the Third District, Nash v. General Motors Corp., 734 So.2d 437 (Fla. 3d DCA 1999), I concur with the majority that the Third District erred by finding drunk driving to be an intentional tort.[21] However, I dissent from the majority's decision to approve Nash to the extent that it is consistent with the majority opinion. Nor do I join in disapproving Kidron, Inc. v. Carmona, 665 So.2d 289 (Fla. 3d DCA 1995) (finding comparative negligence applies in strict liability suits regardless of whether injury occurred in primary or secondary accident). Instead, I would quash Nash and approve the Fourth District's recent decision in Hyundai Motor Co. v. Ferayorni, 795 So.2d 126, 131 (Fla. 4th DCA 2001) (finding error in trial court's refusal to instruct on comparative negligence in strictly liability case).
Judge Terry of Delaware set forth sound advice in Meekins v. Ford Motor Co., 699 A.2d 339 (Del.Super.Ct.1997):
One must be careful to resist the temptation to view this issue in an isolated, over simplified way. Under some circumstances there may exist a clear line of demarcation between the injuries sustained as a result of the initial collision and those enhanced injuries arising from a defective product. The case of a driver running into a tree at a slow speed and being ejected from the car as the result of a defective seat belt, for instance, might create a situation where it is clear that no injuries would have occurred without the ejection. Under those kinds of facts the injuries are so distinct that application of the rule barring evidence of the driver's comparative negligence might be workable, even if not advisable.
However, most cases are not so clear cut. For instance, in the case at bar the plaintiff's car was hit by another vehicle at an intersectional collision. A dispute exists as to whether the plaintiff stopped at the stop sign. A dispute could exist as to whether the driver of the other vehicle was negligent in a way which contributed to the collision. Plaintiff maintains that he would not have been injured at all except for the defective air bag which upon inflating crushed his fingers against the steering wheel. Ford denies that its air bag caused any of the injuries and says that the fingers were injured when the steering wheel spun around as a result of the collision. Here, it is obvious, we have potentially several acts of negligence, all of which might be proximate causes of the plaintiff's injuries.

*445 Under this factual situation it would be difficult and confusing to instruct a jury that it should not consider the cause of the collision but only the cause of the enhanced injuries.
Another logical hurdle inherent in plaintiffs position is this. If a plaintiff negligently crashes his vehicle into a tree and suffers an enhanced injury because of a design defect in his car, plaintiff says that the manufacturer is liable for the enhanced injury regardless of the plaintiff's negligence in causing the collision. But what if a plaintiff collides with another vehicle and the driver of that vehicle is negligent? Assume also that the enhanced injuries caused to the plaintiff by a design defect in his car are clearly identifiable. Under ordinary rules of proximate cause the other driver would have potential liability for all of the plaintiff's injuries, but logically, following the enhanced injury theory of the plaintiff, only the manufacturer should have the liability because the other driver's conduct in causing the initial collision would not have caused the injury absent the design defect. Thus, carrying the theory to its logical conclusion, plaintiff should have no recovery against the other driver for his negligence in causing the collision. This result would run counter to well settled principles of tort law.

Our tort law has historically recognized the fact that there may be more than one proximate cause of an injury. Jurors have had no difficulty in apportioning fault equitably between multiple parties where negligent conduct is the proximate cause of injuries. The existence of other proximate causes of an injury does not relieve a plaintiff driver under Delaware's comparative negligence statute from responsibility for his own conduct which proximately caused him injury. Further, I can discern no policy reason why, in an enhanced injury case, the rule should be any different. Public policy seeks to deter not only manufacturers from producing a defective product but to encourage those who use the product to do so in a responsible manner.
Under plaintiff's theory, a jury would be instructed that it should not consider the negligence of the plaintiff in causing the accident. Rather the jury would be instructed to simply determine what injuries the plaintiff sustained over and above what he probably would have sustained had no defect existed and then award the plaintiff damages for the enhancement.
However, this approach ignores the well established rule of proximate cause. It is obvious that the negligence of a plaintiff who causes the initial collision is one of the proximate causes of all of the injuries he sustained, whether limited to those the original collision would have produced or including those enhanced by a defective product in the second collision.
Id. at 345-46 (emphasis added). I would follow Judge Terry.
Accordingly, I would quash both D'Amario and Nash for the reasons I set forth above.
HARDING, J., concurs.
NOTES
[1] We accepted jurisdiction to review both cases and thereafter consolidated the cases for purposes of appeal and final resolution. We have jurisdiction under article V, section 3(b)(3) of the Florida Constitution.
[2] We say ordinarily because we recognize that in some cases a valid issue may exist as to whether the plaintiff's negligence contributed to the cause of the enhanced injuries. In that case, the automobile manufacturer should be permitted to assert that plaintiff's negligence was a legal cause of the enhanced injuries.
[3] This Court in Evancho expressly declined to address the issue. See Evancho, 327 So.2d at 204 n. 4. Similarly, in Hill, this Court did not expressly address the issue on the face of the opinion. Rather, it adopted the opinion of the district court of appeal on the issue of indemnification. See 404 So.2d at 1052. The district court held that the manufacturer of a defective product may not seek indemnification (through a third party complaint) from the driver and his employer based on their negligence in causing the accident. The court reasoned that a third party complaint based on indemnification may only "lie where the liability if any is `solely vicarious, constructive, derivative or technical.'" Ford Motor Co. v. Hill, 381 So.2d 249, 251 (Fla. 4th DCA 1979), approved, 404 So.2d 1049 (Fla.1981). The court concluded "a defendant manufacturer's defective product, which proximately causes an injury, presupposes much more than mere vicarious liability." Id. These decisions were issued prior to the legislative adoption of comparative fault. Thus, none of these decisions directly resolves the issue before us.
[4] The driver died as a result of burns and smoke inhalation. The record reveals that another passenger was also in the car and he, too, died as a result of smoke inhalation and burn injuries. Both Harris and the driver were fifteen years old at the time of the accident.
[5] The trial court cited Whitehead v. Linkous, 404 So.2d 377 (Fla. 1st DCA 1981), as the legal basis for its ruling. It further ruled that it would allow the defense to proffer evidence of the driver's intoxication at trial.
[6] See Fabre v. Marin, 623 So.2d 1182 (Fla. 1993).
[7] Kidron, Inc. v. Carmona, 665 So.2d 289 (Fla. 3d DCA 1995).
[8] The district court reasoned that although Stellas was decided after the trial court's order in this case, it nevertheless controlled the outcome in this case. See Nash, 734 So.2d at 440. The court further reasoned that the nonparty's conduct of driving while intoxicated constituted an intentional tort. See id. at 440-41 (relying on Ingram v. Pettit, 340 So.2d 922 (Fla.1976)).
[9] In Montag, the Tenth Circuit Court of Appeals rejected the plaintiffs' contention that the cause of the initial accident was irrelevant to their cause of action, in which they sought damages only for the enhanced injuries caused by the design defect in the second collision. In doing so, the court focused on the wording of Colorado's statutory comparative fault scheme:

We have previously recognized, however, that the term "fault" in § 13-21-406 should be given a broad reading. Huffman v. Caterpillar Tractor Co., 908 F.2d 1470 (10th Cir.1990). In Huffman we found that "[t]he term fault, as employed in C.R.S. XX-XX-XXX, is more plausibly construed as a general term encompassing a broad range of culpable behavior including, but not limited to, negligence." Id. at 1477. Furthermore, fault is not limited to assumption of risk or product misuse. Id. Given this broad interpretation of the word "fault," no good reason exists not to allow the jury to compare Mrs. Montag's initial negligence with Honda's fault in designing the seat belt. In every crashworthiness case, the jury will be required to determine how much of a plaintiff's injuries resulted from the initial collision and how much of the injuries were the result of a second collision. In this case, the jury was required to determine which of Mrs. Montag's injuries resulted from her initial collision with the train and which of her injuries resulted from the allegedly defective seat belt. Thus, to an extent, the jury is already comparing the plaintiff's and the defendant's behavior in order to determine causation. Requiring the jury to make a similar determination for the purpose of damages is certainly reasonable and consistent with Colorado's comparative fault statute.
Montag, 75 F.3d at 1419. Hence, the court approved the application of comparative fault principles to the case against the manufacturer.
[10] This view is premised on language in Larsen that suggests that a manufacturer should be liable only for the enhanced injuries caused by the design defect:

Any design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design.
Larsen, 391 F.2d at 503 (emphasis added).
[11] See Whitehead v. Linkous, 404 So.2d 377 (Fla. 1st DCA 1981).
[12] Joint tortfeasors are usually defined as two or more negligent entities whose conduct combines to produce a single injury. See Davidow v. Seyfarth, 58 So.2d 865, 868 (Fla. 1952). In such cases, there need not be a common duty, a common design or a concerted action. See id.
[13] As Reichert points out, the jury would be faced with the task of apportionment while being told at the same time that the initial tortfeasor may be held liable for all the damages, even those caused by the subsequent or second collision.
[14] See also Vendola v. S. Bell Tel. & Tel. Co., 474 So.2d 275 (Fla. 4th DCA 1985) (applying Whitehead in rejecting comparative fault defense by telephone company in suit against it for negligently failing to trace telephone call to plaintiff who had dialed 911 after being shot; holding that plaintiff's shooting was a remote condition which merely furnished occasion for supervening, intervening negligence by Southern Bell).
[15] We do agree that the reasoning of our recent cases discussing the intentional tort exception to statutory apportionment is somewhat analogous to our analysis here. See Merrill Crossings Assocs. v. McDonald, 705 So.2d 560 (Fla.1997); Stellas v. Alamo Rent-A-Car, Inc., 702 So.2d 232 (Fla.1997).

In Merrill Crossings, the plaintiff was shot by an unknown assailant in the parking lot of a Wal-Mart store. He sued Wal-Mart and Merrill Crossings Associates, the owner of the shopping center, for their failure to provide reasonable security measures. The comparative fault of the unknown assailant was not included on the jury verdict form. In holding that the comparative fault provisions of section 768.81 do not apply to such a situation, this Court approved the trial court's action and distinguished Fabre:
In Fabre, the plaintiff was an innocent passenger suing for damages resulting from an automobile accident caused by the combined negligence of her husband and the other driver, where the negligence of both drivers caused the harm. Here, the harm was a directly foreseeable result of Wal-Mart and Merrill Crossing's negligence. In Fabre we dealt with two negligent tortfeasors whose negligence combined to produce the harm; in the instant case we deal with a negligent tortfeasor whose acts or omissions give rise to or permit an intentional tortfeasor's actions.
Merrill Crossings, 705 So.2d at 562 (second emphasis added). Accordingly, this Court concluded that "it would be irrational to allow a party who negligently fails to provide reasonable security measures to reduce its liability because there is an intervening intentional tort, where the intervening intentional tort is exactly what the security measures are supposed to protect against." Id. at 562-63.
We held in Stellas that it was error to include the name of a non-party intentional tortfeasor on the jury verdict form in a suit against a rental car company based on the company's failure to warn the plaintiffs of the danger of touring certain areas of Miami with the name of the rental car company visibly displayed on the car. See 702 So.2d at 234. In both Stellas and Merrill Crossings, the alleged negligence of the named defendants was claimed to have given rise to or resulted in the occurrence of the intentional tort, the very occurrence of which the defendants were supposed to guard against or prevent.
Similarly, under the crashworthiness doctrine, primary collisions such as those involved in both D'Amario and Nash have been deemed to be legally foreseeable and presumed to sometimes occur. In other words, in designing automobiles, Ford and GM, as well as other manufacturers, are charged with the knowledge that their automobiles will sometimes be involved in an accident or collision, including accidents involving negligent and sometimes even drunk drivers, and to reasonably design and build safe vehicles based upon that knowledge. For this reason, both Larsen, and later this Court in Evancho, clearly placed the burden on automobile manufacturers to "use reasonable care in design and manufacture of its product to eliminate unreasonable risk of foreseeable injury." Evancho, 327 So.2d at 204. Of course, we are mindful of the fact that D'Amario and Nash are not directly on point, that under the crashworthiness doctrine automobile manufacturers are not insurers of their cars' fitness, and that automobile manufacturers are under no duty to create a car capable of withstanding all collisions. See Evancho, 327 So.2d at 204.
[16] We recognize that in some cases the jury may not be able to separate the damages from the initial and secondary collisions. Should such event occur, the parties should resort to established precedent in that area of the law. See Gross v. Lyons, 763 So.2d 276 (Fla.2000). Further, as explained in note 2, comparative fault may sometimes be raised if the circumstances require that there be a fair and just allocation of fault and damages. For example, the misuse of a product has been recognized as a defense in product liability actions. See Standard Havens Products, Inc. v. Benitez, 648 So.2d 1192 (Fla.1994).
[17] The attorney for Ford argued that:

Well Mr. Florin and Mr. Wagner [plaintiffs' attorneys] are right to this extent about the animal. They are right to the extent that the cause of this unfortunate injury is a word that starts with an A, but ladies and gentlemen, it's not animal. It's alcohol. It's slamming into a pine tree doing 40 miles an hour.
[18] This confusion is reflected in the juries' verdicts in the consolidated cases. During deliberations, the juries in both cases were asked to indicate on the jury verdict form whether the automobile manufacturers placed the vehicle on the market with a defect which was a legal cause of the enhanced injuries to the plaintiffs. In both cases, the jury answered in the negative. On the face of the jury question, it is impossible to discern whether the jury found no defect, whether the jury found a defect but concluded that it did not proximately cause the enhanced injuries, or whether the jury found the intoxicated driver solely responsible for the plaintiff's injuries. That the jury did not reach the second question as to the drivers' comparative fault is not dispositive. Based on the emphasis placed on the two non-parties' conduct in driving while intoxicated, the jury could have concluded that the drivers' conduct caused the accident and all resulting injuries and, therefore, that the automobile manufacturers were not liable.
[19] Because we are holding that it was error for the trial court to permit evidence of a nonparty's fault in causing the accident, D'Amario's related claim that the trial court erred in permitting Ford to amend its pleadings to include a non-party apportionment defense is moot. Accordingly, we offer no opinion on this issue. Similarly, the other issues discussed in the district court opinions are rendered moot by our holding and we decline to address them.
[20] The majority's general holding states:

We hold that principles of comparative fault concerning apportionment of fault as to the cause of the underlying crash will not ordinarily apply in crashworthiness or enhanced injury cases. Because the manufacturer alleged to be responsible for a defective product that results in a second accident and injury ordinarily may not be held liable for the injuries caused by the initial accident, the fault of the manufacturer may not be compared or apportioned with the fault of the driver of the vehicle who allegedly caused the initial crash.
Majority op. at 426 (footnote omitted).
[21] The state of intoxication of the driver of the car which collided with the car driven by Maria Nash should be handled as a section 90.403 issue, as was done by the trial court in D'Amario. However, that issue is not presented in Nash.